## MIDKIFF v. COLTON et al. *

### (Circuit Court of Appeals, Fourth Circuit. May 1, 1917.)

### No. 1421.

1. DEEDS ☞45—EXECUTION BY GRANTEE—NECESSITY.

Where a deed from the successful plaintiff in an action of ejectment to the defendants, with a reservation of minerals, contained a provision that the grantees thereby accepted the deed and the estate thereby conveyed upon the terms and conditions, and subject to the exceptions and reservations, therein contained, it contemplated that the acceptance by the grantees should be evidenced by their signatures to the paper itself.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 89-94.]

2. DEEDS ☞208(6)—ACCEPTANCE—SUFFICIENCY OF EVIDENCE.

Evidence held to show that such deed, found in the possession of one of the defendants, unsigned by any of the grantees, more than 30 years after it was left with the grantees, had not been accepted by them.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. § 631.]

3. DEEDS ☞66—DELIVERY AND ACCEPTANCE—QUESTIONS OF LAW OR FACT.

The delivery and acceptance of a deed is a mixed question of law and fact; it being the province of the jury to find the facts, whereupon the court applies the law.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 127, 633.]

4. DEEDS ☞194(4)—DELIVERY AND ACCEPTANCE—PRESUMPTIONS AND BURDEN OF PROOF.

Where the successful plaintiff in an action of ejectment executed a deed to the defendants, reserving minerals, and contemplating that the grantees' acceptance should be evidenced by their signatures, and defendants had been in possession of the land long before the action was brought, and continued in possession uninterruptedly for more than 30 years after the judgment was rendered, and the plaintiff never executed any writ of possession, exercised dominion over any part of the land, or undertook to assert ownership of either the surface or the minerals during that time, the mere fact that the deed, unsigned by the grantees, was found in

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Rehearing granted May 31, 1917.

possession of one of the grantees, did not raise a presumption of ɛ delivery and acceptance, which would shift the burden of proving delivery and acceptance.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 579, 634.]

5. DEEDS ⬤⟹208(6)—DELIVERY AND ACCEPTANCE—SUFFICIENCY OF EVIDENCE.
If such presumption existed, it was overthrown by the positive, direct, and uncontradicted testimony of the only witness examined in regard to it that the deed was never accepted.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. § 631.]

6. VENDOR AND PURCHASER ⬤⟹233—BONA FIDE PURCHASERS—UNRECORDED DEED.
An unrecorded deed from the successful plaintiff in an ejectment action to the defendants, with a reservation of the minerals, even though binding on such defendants, did not affect the rights of a subsequent purchaser, in the absence of notice of its existence.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 563–566.]

7. VENDOR AND PURCHASER ⬤⟹244—BONA FIDE PURCHASERS—SUFFICIENCY OF EVIDENCE.
Evidence *held* to show that a purchaser of land had no notice of an unrecorded deed to his predecessors in title from a party recovering against them in ejectment, containing a reservation of minerals.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 609–611.]

8. PRINCIPAL AND AGENT ⬤⟹111(4)—AUTHORITY OF AGENT—COMPROMISE— "PENDING."
A power of attorney, authorizing the agent to make such deeds as might be necessary in order to settle and compromise certain actions of ejectment, described as then pending and undetermined as to some of the defendants therein, and to carry out compromises already agreed upon with other defendants, against whom judgments by default had been or might be obtained, did not authorize the agent to execute a deed in consideration of the grantees' consent to a reservation of minerals to persons against whom judgment had been recovered, in an action in which they entered their plea denying plaintiff's right to recover, since the judgment against them was not by default, there was no basis for a compromise, and the action was not pending, as "pending" means begun, but not yet completed, settled, determined, or in process of settlement or adjustment, and an action or suit is said to be pending from its inception until the rendition of final judgment.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 329, 376.

For other definitions, see Words and Phrases, First and Second Series. Pending.]

9. PRINCIPAL AND AGENT ⬤⟹150(2)—ACTS IN EXCESS OF AUTHORITY—LIABILITY OF AGENT.
An attorney under a special power cannot bind his principal by an act ultra vires; the authority of the agent in fact being limited by the terms of the instrument conferring the power.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. § 557.]

10. PRINCIPAL AND AGENT ⬤⟹97—CONSTRUCTION OF POWER OF ATTORNEY.
The authority of an agent acting under special power must be ascertained from the terms of the instrument itself.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 344–376.]

Woods, Circuit Judge, dissenting.

⬤⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the District Court of the United States for the Southern District of West Virginia, at Huntington; Benjamin F. Keller, Judge.

Suit by Sabin W. Colton, Jr., and others, trustees of the Guyandotte Land Association, against Newton Midkiff. From a decree in favor of plaintiffs, defendant appeals. Reversed and remanded.

In 1874, William H. Aspinwall, Abiel A. Low, and others brought action of ejectment against Winchester Adkins and others, in the United States District Court for the then District of West Virginia, claiming title, under grants, to 200,000 acres of land within a common boundary, and included within this boundary was 191 acres in possession of Lewis Midkiff, who had been living on it for several years before the commencement of the action, claiming to be the owner in fee simple. Lewis Midkiff was made one of the defendants in the action. He died in 1880, whilst the action was pending, and an order was entered making his heirs at law parties defendant to the suit, among whom were Abraham Midkiff and Solomon Midkiff, sons, and Harriett Adkins, a daughter. In May, 1880, these defendants came in without process and entered a plea of "not guilty," and on the same day the record shows that the cause was heard and judgment entered against all of the defendants, awarding the title to the lands sought in the action to the plaintiffs. On the 20th of August, 1880, a writ of possession was issued on the judgment against the Midkiff heirs and others of the defendants, but it appears from the record that this writ was never served.

In April, 1879, whilst the action of ejectment was pending and before the final judgment, as stated, the plaintiffs in the action executed an instrument, constituting J. I. Kuhn their attorney in fact, conferring upon him authority to make compromises and settlements in regard to the lands in controversy; this authority being contained in the following, which we copy from the instrument: "To make, execute, sign, seal, and acknowledge for record, and deliver for and in our names, such deeds of grant and release (but without warranty or covenants of any kind, general or special, express or implied), in the form below given, as may be necessary and proper to execute, in order to settle and compromise certain actions of ejectment now pending in the District Court of the United States for the District of West Virginia, and undetermined as to some of the defendants therein, and to convey out compromises already agreed upon with other defendants in said actions, against whom judgments by default have been or may hereafter be obtained. * * *"

On the 15th of September, 1882, Kuhn went to the house of Abraham Midkiff, one of the defendants, and left in his possession a paper writing, purporting to be a deed executed by the said Kuhn, as attorney in fact, for the plaintiffs in the ejectment suit, to Abraham H. Midkiff, Solomon R. Midkiff, and Harriett Adkins, the three defendants before named. This instrument recited that for a nominal consideration the lands which were recovered from the defendants, about 194 acres, in the action of ejectment (without stating that they had been so recovered), were conveyed to the said Abraham H. Midkiff, Solomon R. Midkiff, and Harriett Adkins in fee simple, reserving, however, to the grantors the minerals, oil, and gas, with the right of entry for the purpose of utilizing them, which reservation is set out in the instrument in the following language: "But it is expressly understood that the parties of the first part reserve and except from the operation of this deed to themselves, and to their heirs and assigns forever, all the minerals, mineral substances, and oils, of every sort and description, in and upon said real estate herein described, and in every part thereof, with the privileges of mining, digging, and excavating for said minerals and mineral substances, and of boring and pumping for said oils, and of erecting and maintaining thereon all of the necessary buildings, oil tanks, machinery, and apparatus for working and operating all mines, pits, excavations, and oil wells, which now are, or may be hereafter, opened, worked, and operated on said real estate, or any part of it, and for storing and taking care of the products thereof, by the parties of

the first part, their heirs and assigns. They also except and reserve, as aforesaid, all necessary rights of way in, through, on, or over said real estate to and from all said mines, pits, excavations, oil tanks, and oil wells, and the right and privilege to construct, operate, and maintain thereon such railroads and other roads, and pipe lines, in, through, on, or over said real estate as may be necessary to the successful and convenient discovery, working, and operating of the said mines, pits, excavations, and oil wells, and for carrying away the products thereof."

This instrument also contained the following as the closing paragraph: "And the parties of the second part hereby accept this deed, and the estate hereby conveyed, upon the terms and conditions, and subject to the exceptions and reservations, herein contained and set forth." It further appears that the paper writing was never probated or put to record.

In 1888, Abraham Midkiff and his brother Solomon bought from the other heirs at law of Lewis Midkiff their interests in the 194 acres, taking their deed therefor, and in 1892 they made partition between themselves; each having assigned to him 97 acres. On the 14th of April, 1899, Newton Midkiff, the appellant, who is a son of Abraham Midkiff, bought the 97 acres, which belonged to his father, under the division between him and his brother Solomon, which was conveyed to the said Newton Midkiff by deed, for the consideration of $1,000 cash. Newton went immediately into possession of the land and erected thereon a house costing some $2,500, and made other valuable and permanent improvements. He has continuously since resided upon the lands claiming them as his own in fee simple.

The record further shows that these lands, from the time that Lewis Midkiff went into possession in 1867, have been listed for taxation in his name, and subsequently in the name of his heirs heretofore mentioned, and then the one-half in the name of appellant, Newton Midkiff, after he purchased from his father, and that the taxes have from time to time been paid by them, without any deduction for mineral rights, or other interests claimed not to be owned by them.

In the present case, Sabin W. Colton and others, trustees of the Guyandotte Land Association, as the successors in interest to the said Low and Aspinwall and others, claiming under the proceeding in the ejectment suit, and by virtue of the instrument left by Kuhn in the possession of Abraham Midkiff, have filed their bill of complaint in equity, alleging that the instrument referred to conveyed only the surface of the land to the Midkiffs, reserving the mineral rights, etc., and that Newton Midkiff, the appellant, purchased the lands now in controversy with notice of that fact. The bill further alleges that this instrument, the paper writing which was never put to record, had been lost, and in the suit it is sought to establish this lost paper as a deed, and thereupon to have a decree that the complainants are the owners of the minerals, oil, and gas in the appellant's lands. It further appears from the record that the appellant had leased to G. H. Dimmick & Co. the mineral rights in the 97 acres of which he was in possession. These lessees are also made defendants. The complainants also prayed in their bill that said appellant and said lessees be enjoined from carrying out the terms of the lease.

The only testimony bearing upon the paper writing which is undertaken to be set up as a deed, and which is alleged to have been lost, is that of Abraham Midkiff and Newton Midkiff, the appellant in this case; Kuhn, the attorney, having died in the meantime. Abraham Midkiff testified that Kuhn came to his house with this instrument; which the witness describes as some kind of a deed for everybody that would compromise with him (Kuhn). Kuhn said to witness: "'We claim a big judgment against your father and your uncle, and if you will deed us the mineral, we will deed you the land.' And I told him I would see about it, and 'if you have got a judgment, why, of course, I will give you the minerals, rather than for you to take the land.' He then says, 'You see, and if you find out I am telling the truth, we will compromise.' But I did not compromise, but after investigating what I had heard I did not make any deed of compromise with Kuhn. He left the deed with me and said, 'If I wanted to compromise to send it to him.' I never bothered about it, and never did write to him. I never accepted the deed in any way."

Newton Midkiff, the appellant, testified in substance, that after the bringing of this suit he called upon his Uncle Sol. to confer with him about making some arrangements about it, and "he asked me if I knew where the deed from Kuhn was, and I says, 'No; I don't know anything about it.' He went on talking about this deed, and he informed me that he had it, and I told him to give it to me, and I would lock it up in my safe. I never knew there was such a deed on earth. When my father and Uncle Sol. made the division, they must have gotten that deed in between them in some way or another. That was the first I ever knew of that deed."

There were only three witnesses examined in the trial; the third being John H. Meek, who was introduced by the complainants and testified as to being local attorney and business agent for them, and had occupied that relation for the last 10 years. He knew the lands embraced in the verdict in the ejectment suit, and about the possession of the same by complainants; had mined on this land at a point called Dingess, and drilled some oil wells at other places: these points were some distance from the Midkiff lands. There was no evidence that the complainants or their predecessors had at any time taken actual possession of the land in controversy, or had entered thereon to assert any right or interest therein. The Kuhn paper was produced on the trial of the present case by order of court by the appellant, and when exhibited it showed that neither Abraham Midkiff, Solomon Midkiff, nor Harriett Adkins had signed it; the only signature being that of Kuhn as attorney in fact for the several parties, who executed the power of attorney to him.

The case was heard, and the District Court entered a decree, from which the following is copied: "That the Kuhn deed to the Midkiffs be and the same is established; that the title of the plaintiffs in and to the minerals, oils, coal, or gas in, under, and upon the tract or parcel of land in the said deed mentioned, including the mining rights and privileges by the said deed excepted and reserved by them, are hereby confirmed and established unto the plaintiffs, and that the said plaintiffs be quieted in the possession and title thereto; that all deeds, leases and other evidences of title under which the defendant, Newton Midkiff, or any one claiming through, by, or under him, asserts title or claim to the said minerals, oil, coal, or gas in and underlying so much of the tract of land in the deed aforesaid described as was conveyed to him by Abraham H. Midkiff and others, and described in the deed filed with his answer herein in words and figures following, to wit: 'Beginning at the mouth of the third branch above Fall creek, thence with said branch to the head thereof, thence a straight line to a stone in the back line, thence in a southeasterly direction to ash corner of G. H. Damron land, thence in a northeasterly direction with the line of Emmer Slone and Bennett Midkiff to Viola Midkiff line, and thence with her line back to the river, thence down with the river to the beginning, containing one hundred acres, more or less. This deed made in lieu of a deed that has been heretofore made and was destroyed by fire'—be and the same are hereby set aside, canceled, and held for naught, in so far as they purport to convey, lease, or otherwise alienate any interest in the said minerals, oil, gas, or coal in, under, or upon said land, or any part thereof, as clouds upon the title of the plaintiffs thereto; and the defendant, Newton Midkiff, G. H. Dimmick, Interstate Gas Company, and all persons claiming under them, are perpetually enjoined, restrained, and inhibited from incumbering, conveying, alienating, or in any wise asserting title to the minerals, oil, gas. or coal in, under, and upon said land, or upon any part thereof. and from in any wise hindering, delaying, obstructing, or interfering with the plaintiffs or their lessees, or the servants, agents, or employés of their lessees, or any one claiming under them, in the use and development of the said minerals, coal, oils, or gas; and leave is given the plaintiffs to withdraw the original deed from J. I. Kuhn, attorney in fact, to Abraham H. Midkiff and others, filed by Newton Midkiff herein, for the purpose of having the same recorded in Lincoln county, West Virginia, and when so recorded said deed shall be redelivered to the said Newton Midkiff." And from this decree, the defendant, Newton Midkiff, appealed to this court.

Maynard F. Stiles, of Charleston, W. Va., for appellant.

W. R. Thompson, of Huntington, W. Va. (J. S. Clark and H. A. McCarthy, both of Philadelphia, Pa., and W. C. W. Renshaw, J. H. Meek, and Z. T. Vinson, all of Huntington, W. Va., on the brief), for appellees.

Before PRITCHARD and WOODS, Circuit Judges, and BOYD, District Judge.

BOYD, District Judge (after stating the facts as above). There are several questions presented to the court upon this appeal, and which were argued orally by counsel, and are also discussed in the briefs which have been filed. The question of jurisdiction of a court of chancery to entertain the case at all is raised. The view is advanced that the instrument left by Kuhn with Abraham Midkiff had never been lost, but was in existence and was produced in court when it was called for, and therefore a bill to establish a lost paper could not be maintained. It is further argued that the question as to whether there was an actual delivery of the Kuhn paper as a deed is an issue of fact to be tried by a jury, and is not a matter cognizable in a court of equity. It is also insisted that the appellant was in adverse possession of the land involved in this controversy, claiming it as his own in fee simple, to well-defined metes and bounds, for a sufficient length of time to ripen a title, and that this is also an issue of fact to be tried by a jury.

The further question, as to whether the appellant took the deed from his father for the land in controversy, with notice of the existence of the Kuhn paper, is also presented. There is still another proposition which is called to our attention by appellant's counsel, and that is that the Kuhn paper contemplated that there was to be an acceptance of it by the two Midkiffs and Harriett Adkins; not only that they were to accept the custody or the possession of it, but to testify their acceptance by signing the instrument itself, under the provisions of the last paragraph.

[1] We do not deem it necessary, in order to dispose of this case, to consider all of these several questions, but to advert only to the instrument itself (which we shall refer to as the Kuhn paper), and which the complainants rely upon as their muniment of title authorizing a recovery. The first proposition is whether this paper was delivered by Kuhn and accepted by the Midkiffs as a deed. The last paragraph undoubtedly contemplated that the acceptance by the grantees should be evidenced by their signatures to the paper itself; but it was never signed by them or any of them, its delivery to them was never acknowledged, nor was it admitted to probate or recorded; indeed, there was no evidence that Harriett Adkins, one of the Midkiff heirs and one of the grantees, ever saw it.

[2] The testimony relative to what occurred between Abraham Midkiff and Kuhn at the time the paper was handed to the former is exceedingly meager. Kuhn died before the trial of the case, and there was no witness, save Abraham Midkiff, who testified as to that transaction. On the stand he stated in substance: That Kuhn came to

his house with this instrument, which witness describes as some kind of a deed for everybody that would compromise with him (Kuhn). Kuhn said to witness: " 'We claim a big judgment against your father and your uncle, and if you will deed us the mineral, we will deed you the land,' and I told him I would see about it, and 'if you have got a judgment, why, of course, I will give you the mineral rather than for you to take the land.' He says then, 'You see, and if you find out I am telling the truth, we will compromise.' But I did not compromise, but after investigating what I had heard I did not make any deed of compromise with Kuhn. He left the deed with me and said, 'if I wanted to compromise to send it to him.' I never bothered about it, and never did write to him. I never accepted the deed in any way." After the present suit was brought, this paper was found in the possession of Solomon Midkiff, still unsigned by any of the grantees.

[3] The principle is well settled that the delivery and acceptance of a deed is a mixed question of law and fact. It is the province of a jury to find the facts; thereupon the court applies the law. Johnston v. Kramer Brothers & Co. (D. C.) 203 Fed. 733; Henry v. Heggie, 163 N. C. 523, see page 527, 79 S. E. 982. In the present case, the trial court in chancery, we must assume, in view of the decree entered, found as a fact that the Kuhn paper was delivered by Kuhn and accepted by Abraham Midkiff, Solomon Midkiff, and Harriett Adkins. We are unable to find in the record any evidence sufficient to warrant such finding; on the other hand, as we have stated, the only testimony upon this question was a denial of acceptance. As bearing upon the question as to whether the Midkiffs accepted this paper as a deed, it is an undisputed fact that they remained in possession of the entire premises, beginning long before the institution of the original action of ejectment, and continuing uninterruptedly until the bringing of the present suit, which was in 1911, save in so far as their possession was affected by the entry of the judgment. No writ of possession was ever executed, and the parties who recovered the judgment in the ejectment action never, so far as the record shows, exercised any dominion over any part of the Midkiff land, or undertook to assert ownership of either the surface or the minerals, but permitted more than 30 years from the rendition of the ejectment judgment to elapse before the present suit was brought.

It seems to us that a court of equity should not incline to favor parties guilty of such laches. During the intervening years between the ejectment judgment and the commencement of this suit, those claiming under that judgment, or their successors, who are now undertaking to recover possession of the minerals, etc., under the Kuhn paper, could have investigated and ascertained, if it had been accepted by the Midkiffs in the form contemplated, or if it had been acknowledged by them, or if it had been put to record. None of these things were done, nor were any steps taken to assert or protect the claim of ownership under the said judgment or under the paper now in controversy.

[4, 5] The mere fact that this paper was found in possession of one of the persons named therein as grantee does not, we think, under

all the circumstances connected with the transaction, raise a presumption of a delivery and acceptance which would shift the burden from complainants of proving delivery and acceptance. If, however, the presumption did exist, it was overthrown by the positive, direct, and uncontradicted testimony of the only witness examined in regard to it, to the effect that it was never accepted. We cite Guggenheimer v. Lockridge, 39 W. Va. 457, 19 S. E. 874, as bearing upon this point. The court in that case says:

"A deed must not only be delivered by the grantor, but must also be accepted by the grantee. Acceptance may be expressed by signing the deed or otherwise, or may be.implied from circumstances. The assent of the grantee will be presumed, where the deed is beneficial to him, until dissent appear. Where dissent or disclaimer appears, the deed is inoperative, and the title to the thing granted reverts to the grantor by remitter from such disclaimer."

[6] We go further, and assuming, for the sake of the argument, that under all the circumstances the Kuhn paper estopped Abraham Midkiff, Solomon Midkiff, and Harriett Adkins from controverting the claim of complainants, it would not affect the rights of appellant, Newton Midkiff, in the absence of notice of its existence. The trial court must have been of the opinion that he had notice. The record does not disclose any direct testimony or forceful circumstances to lead to the conclusion that appellant had ever seen or heard of the Kuhn paper anterior to the time it was found in the possession of Solomon Midkiff after the present suit was brought.

[7] Appellant, when examined with reference to the paper, testified as follows:

"Q. Mr. Midkiff, when was the first time you ever saw this deed, or knew anything about its existence? A. Some time after this suit was brought. Q. Was the time you spoke of having gotten it from Solomon Midkiff the first you knew anything about it? A. The first time I ever remember of that deed. Q. Did you have any knowledge or information of that deed, its whereabouts or existence, from Kuhn to Abraham H. Midkiff and others for this land? A. No, sir. Q. Did you ever have any knowledge of this deed or its existence before the time you obtained it from Solomon R. Midkiff? A. I never heard of it that I remember of. Q. Are you positive that the Sunday morning you went down and got this deed from Solomon R. Midkiff was after you had been notified in this suit? A. Yes, sir; I went down there to make same arrangements about getting a lawyer to attend to the suit, and we got to talking about the deed, and he asked me if I knew where it was, and I told him, 'No, I didn't know anything about it.'"

Abraham Midkiff, when he was interrogated about it on the stand, said this:

"Q. Did you talk to the boys about this Kuhn deed—about what to do with it? A. Everybody was talking about 'em then. Q. Did you talk to your wife about it? A. She said to sign no deed until we found out about it. Q. And you talked to the boys about it? A. I don't remember. Q. When did you and Newt first talk about it? A. I reckon it was when I first sold him the land. I told him Kuhn wanted me to compromise, and I never had, and never expected to. I told him Kuhn wanted me to acknowledge it, and I never would do it."

The appellant's testimony is positive and direct in its character and to the effect that he never saw, knew of, or heard about the Kuhn paper until after the bringing of the present suit, when he found it in the

possession of his Uncle Solomon. Abraham Midkiff's testimony in respect to the Kuhn paper in connection with the appellant is not of a positive nature or direct character. He reckons (to use his own expression) that he first talked to appellant about it when he sold him the land, and told him that Kuhn wanted him to compromise, but he never did, and never expected to, and told him further that Kuhn wanted him to acknowledge the paper, and that he would never do it. It will be observed that Abraham nowhere says that he ever exhibited any paper purporting to be a deed of conveyance to appellant, or informed him of the existence of such paper, and there is no evidence worthy of consideration that the appellant ever saw the Kuhn paper until the time he states.

A forceful fact in this case is that the Midkiffs had been at all times in possession, beginning with the possession of Lewis Midkiff, the appellant's grandfather, anterior to the bringing of the ejectment suit; following after the death of Lewis Midkiff was the joint possession of his heirs at law, Abraham Midkiff, Solomon Midkiff, and Harriett Adkins. They exercised undisputed dominion and control over the entire lands, the boundaries of which were certainly defined and well known, and during all this time no one appeared to assert any right, title, or claim to the land or any interest whatever therein. The appellant was cognizant of this situation; saw the character of ownership which his grandfather and his father and his uncle and his aunt asserted. Under these circumstances he bought the parcel of land now in controversy, paid for it, not only a valuable consideration, but a fair price, took a deed from his father, which the evidence shows he caused to be registered, and thereby gave notice to the world of his title. He set about and erected a valuable dwelling and made other substantial improvements upon the premises. It is not, in our opinion, a reasonable conclusion that the appellant would have done all these things if there was any suggestion to him that there was a defect in the title to the lands. We say further that the weight of the evidence sustains the view that appellant had no notice of the Kuhn paper, and we think that it should have been so held by the trial court. We cite as in unison with the views we have been expressing the case of Hodges v. Eddy, 41 Vt. 485, 98 Am. Dec. 612, and also 10 R. C. L. 845, under the head of "Burden and Quantum of Proof."

[8] Aside from what we have said, there is another view of the Kuhn paper which we entertain, and which we regard as decisive of the case, and that is, at the time Kuhn delivered this paper to Abraham Midkiff and sought his acceptance of its provisions, together with the acceptance of his brother Solomon and sister Harriett Adkins, he was not authorized as the attorney in fact of the plaintiffs in the ejectment suit to execute and deliver a deed in this particular instance. There is no ambiguity in the power of attorney, for it plainly sets forth what was intended, viz. that Kuhn was empowered to execute deeds to carry out settlements and compromises in pending suits, not yet determined, and to make deeds to carry out compromises already agreed upon with defendants against whom judgments by default had been, or might thereafter, be obtained. It will be seen from this that Kuhn's

authority to execute deeds was limited to two contingencies; the one, when compromises were effected pending the action, and the other, in cases where judgments by default were obtained, terms of compromise having been already agreed on. It is a reasonable conclusion that the plaintiffs in the action of ejectment, after they had obtained a judgment for the recovery of the entire lands of a defendant, would not concede to such defendant an interest in the land as a gratuity, and therefore the power to Kuhn to execute a deed after a suit was ended was limited to instances in which there were judgments by default obtained after terms of settlement, or terms of compromise, were agreed on, but not completed.

There was nothing to induce a compromise by the plaintiffs in the ejectment suit with the two Midkiffs and their sister, Harriett Adkins, at the time of the execution of the Kuhn paper sought to be set up as a deed. The action so far as they were concerned was ended by a final judgment, by virtue of which the whole interest in the land was awarded to the plaintiffs, and there is no suggestion that there had been any compromise agreed on with them before the judgment against them was obtained. Further than this, the judgment against the two Midkiffs and their sister was not by default; but, as appears from the record, they had entered their plea, denying the right of plaintiffs to recover, and the issue thus raised was decided against them, so they had no interest left in the subject-matter of the action to constitute a basis of compromise. Further, at the time Kuhn visited Abraham Midkiff and left the paper, the action against the two Midkiffs and Harriett Adkins, as heirs at law of Lewis Midkiff, had been ended by a final judgment, and the issuance of the writ of possession. Mr. Black, in his Law Dictionary (second edition, page 887), under the head of "Pending" uses this language:

"Begun, but not yet completed; unsettled; undetermined; in process of settlement or adjustment. Thus, an action or suit is said to be pending from its inception until the rendition of final judgment."

And he cites in support these cases: Wentworth v. Farmington, 48 N. H. 210; Mauney v. Pemberton, 75 N. C. 221; Ex parte Munford, 57 Mo. 603.

To restate our views, we are of the opinion that the Kuhn paper was not executed during the pendency of the suit against the persons named therein as grantees; that the judgment against the two Midkiffs and Harriett Adkins was not by default, but was taken after they had appeared and entered their formal plea, denying plaintiffs' right to recover; that there were no terms of compromise or settlement entered into with the parties named, during the pendency of the action against them; that under the circumstances Kuhn was not authorized to execute a deed, in the name of his principals, to the two Midkiffs and their sister Harriett Adkins. The purpose of the principals in constituting Kuhn their attorney and empowering him to make deeds was undoubtedly to secure compromises of controversies or to settle adverse claims affecting the lands involved in the suit. It was not to empower him to give away lands, or interests in lands, to which their title in fee simple had been finally confirmed by a judgment of court

in a trial of an action of ejectment, upon the issue raised by defendant's plea of "not guilty."

[9] It is well settled that an attorney under special power cannot bind his principal by an act ultra vires; in other words, the authority of an attorney in fact is limited by the terms of the instrument which confers the power. Holladay v. Daily, 19 Wall. 606, see page 610, 22 L. Ed. 187.

[10] The authority of an agent acting under special power must be ascertained from the terms of the instrument itself. Henry v. Lane, 128 Fed. 243, see page 250, and cases cited in the opinion (62 C. C. A. 625).

It necessarily follows, from the views that we have expressed, that our opinion is that the Kuhn paper could not be established as a deed, and that the decree of the District Court to that effect was erroneous. The said decree is therefore reversed, and the case remanded, to the end that complainants' bill may be dismissed.

Reversed.

WOODS, Circuit Judge. I dissent. The statement of the case made in the majority opinion makes clear the questions involved and the nature of the suit.

It is first contended by appellant that the suit must fail, and the judgment must be reversed, because the deed executed by Kuhn under power of attorney which complainants seek to establish was not authorized by the authority conferred on him. It is true that the power of attorney on its face gives authority to execute such deeds "as may be proper and necessary to execute in order to settle and compromise certain actions of ejectment now pending," and the deed here in question was not executed until after the suit had culminated in a judgment in favor of the plaintiffs. But if the grantees accepted the deed and held the land under it, they would be estopped from alleging its invalidity against Kuhn's principals, ratifying it and claiming under it. They could not accept the benefit of it by remaining in possession and using the land, and afterwards repudiate it in the effort to escape its limitations and reservations.

The next defense is that the deed conveying the surface to the Midkiffs and reserving the mineral rights was never accepted. At the time the deed was made the grantees had been adjudged to have no interest whatever in the land. Since the deed conferred benefits on them, and was found in the possession of one of the grantees, Abraham Midkiff, there is a strong presumption of its acceptance, at least by him. Abraham testified that he could not remember whether Solomon and his sister, Harriett Adkins, the other grantees named in the deed, were present when the deed was given to him or not, but he testified that he had talked to Solomon about it. The ejectment suit and its results were subjects of great notoriety in the community. The deed was the subject of earnest discussion in the family. It was retained and carefully preserved by Solomon and Abraham Midkiff, two of the grantees. Abraham, the grantee who originally received the deed, afterwards acquired the interests of the others. After that acquisi-

tion he was still presumptively holding under the deed when he sold to his son, Newton Midkiff, in 1899. He testified that at the time he sold to Newton he talked with him about the deed.

I cannot resist the conclusion from the evidence that the existence of the deed was well known and much discussed in the entire family, and that it had been accepted and preserved as a muniment of title. The only evidence tending to show that the deed was not accepted is that of Abraham Midkiff that it was brought to him by Kuhn as a proposition to compromise the judgment in ejectment, and was received by him with the understanding that if it was accepted as a compromise he was to return it to Kuhn, and that he concluded not to accept it, and said nothing more to Kuhn about the matter. The statement that the grantees were to return to the grantors the deed if accepted, which was their only protection from actual ejectment, even if it were not disproved by the circumstances, is intrinsically improbable, if not incredible. The danger of its acceptance by the court is emphasized by the fact that Kuhn, the attorney in fact who made the deed, is dead. When its improbability is considered in connection with the other circumstances showing acceptance of the deed, it seems to me the defendant's case is without substantial foundation. If the grantee of a deed, who had no title to the land, and who received the deed from the true owners at the time it was made, carefully preserved it, and produced it from his possession, can be allowed to defeat it by testifying that he never accepted it, and that he has been holding adversely to it, the result would be unfortunate insecurity of land titles.

Equally untenable is the position that Newton Midkiff was a purchaser for value without notice. It is true he denies that he had any notice of the deed until the commencement of this suit; but Abraham Midkiff, his father, a witness introduced by him, testified that he talked with him about the deed at the time he purchased. Thus he was put upon notice of its contents. Nor is Newton Midkiff in a position to claim the minerals by adverse possession. At the time he purchased from Solomon, the minerals and the surface had been severed by a conveyance of the true owners of the land with a reservation of the minerals. He bought with notice of this severance, and therefore could not claim the coal by adverse possession of the surface. Adverse possession of the coal could have been started only by actual working of the coal, or some other act of dominion over the minerals, showing assertion of title and use in accordance therewith. Wallace v. Elm Grove Coal Co., 58 W. Va. 449, 52 S. E. 485, 6 Ann. Cas. 140; Plant v. Humphries, 66 W. Va. 88, 66 S. E. 94, 26 L. R. A. (N. S.) 558; Kiser v. McLean, 67 W. Va. 294, 67 S. E. 725, 140 Am. St. Rep. 948; Steinman v. Jessee, 108 Va. 567, 62 S. E. 275.

The finding of the District Court seems to me to be supported by the clear preponderance of the testimony.